UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIC, L.P., individually, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>BEAR STEARNS ASSET MANAGEMENT INC., RALPH CIOFFI, RAYMOND McGARRIGAL, MATTHEW TANNIN, BEAR STEARNS SECURITIES CORPORATION, BEAR STEARNS COMPANIES INC. and BEAR STEARNS & CO. INC.,<br><br>        Defendants. | No.  07-cv-11477 (LAK)<br><br>ECF CASE<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, FIC, L.P. by its undersigned attorneys, as and for this Class Action Complaint, herein alleges, upon personal knowledge as to itself and its own actions and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.     This is a class action on behalf of purchasers of limited partnership interests in Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund L.P. (the "Partnership") against the General Partner of the Partnership, Bear Stearns Asset Management ("BSAM"), and its managers, Defendants Ralph Cioffi, Raymond McGarrigal and Matthew Tannin (the "Management Defendants") for engaging in fraud, willful misconduct, bad faith and gross negligence that amounted to a breach of its fiduciaries to Plaintiff and  the other limited partners in the Partnership.  This class action also seeks relief from those entities who aided and abetted these Defendants' breaches of

fiduciary duty. Plaintiff also asserts claims arising out the Defendants breach of the limited partnership agreement (the "Partnership Agreement") entered into with Plaintiff.

2.      This case involves the complete collapse of the two hedge funds, both managed by the defendants, the first was Bear Stearns High-Grade Structured Credit Strategies, L.P. ("High Grade Fund") and the second, the Partnership. The Partnership was created by BSAM in June 2006 and raised $642 million from Plaintiff and the Class. The High Grade Fund was created in December 2004. Both hedge funds were managed by the Defendants, and their sudden collapse in July 2003 caused hundreds of millions of dollars in losses to Plaintiff and the Class. In the Confidential Private Placement Memorandum ("PPM"), the BSAM, General Partner of the Partnership, trumpeted the credentials, competence and expertise of the managers of the Fund and their affiliation with Bear Stearns – one of the most respected Wall Street investment banks and brokerage houses – creating the imprimatur that the Partnership would be managed with the utmost good faith, honesty and loyalty to its limited partners.

3.      The Fund's assets – the Class' investments – were invested through a "Master Fund", an entity organized under the laws of the Cayman Islands and which made its investments under the advice and direction of BSAM and the Management Defendants. Contrary to the Defendants' representations to the Class, and in dereliction of their duties to the Class, the General Partner and its managers willfully ignored the terms of the PPM and their duties under it and applicable law, misrepresented to the Class the manner in which the Fund would be managed and their assets invested, lied to the Class about the performance of the Fund, inflated the value of the Fund's assets, concealed the true financial relationship between the Fund and entities which provided

leverage for the Fund's investments, and protected their own personal investments in the Fund by extracting their personal investments when the Fund appeared to be in serious financial condition, despite denying the same benefit to the Class. These acts also breached the express terms of the Partnership Agreement.

4.     On July 30, 2007, the Master Fund filed for bankruptcy protection in a Cayman Islands bankruptcy court. The SEC has announced an investigation into illegal insider dealing engaged in by Defendant Cioffi, who withdrew from the Partnership $2 million of his $6 million in his capital account in the weeks before the Fund's collapse. Moreover, Bear Stearns has demoted two of the Management Defendants in connection with their roles in causing the collapse of the Master Fund and Bear Stearns has fired its chief executive, William Spector ("Spector"), who was in charge of asset management for the firm.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000. The Court has personal jurisdiction over Defendants because Defendants committed material events giving rise to this action in this District and Defendants systematically and continuously conduct business in this state and maintain offices within this District.

6.     Venue is proper in this District under 28 U.S.C. §1391 because Defendants engaged in substantial conduct relevant to Plaintiff's claims within this District and caused harm to certain class members residing within this District. In addition, pursuant to the agreements entered between the limited partners of the Partnership and the General Partner, all suits arising from the Subscription Agreement

and any and all transactions relating thereto may be brought in the courts of the State of New York.

## THE PARTIES

7.    Plaintiff FIC, L.P. is a limited partnership, with its principal residence in San Francisco, California.  Plaintiff is the legal and beneficial owner of a limited partnership interest in the Partnership.

8.    Defendant Bear Stearns Asset Management Inc. ("BSAM") is a corporation organized under the laws of the State of New York with its principal place of business at 383 Madison Avenue, New York, New York.  BSAM is the General Partner in the Partnerships.  BSAM is also the Investment Manager for the Partnership.

9.    Defendant Bear Stearns Securities Corporation ("BSSC") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Metrotech Center North, Brooklyn, New York.  BSSC acted as prime broker and custodian to the Master Fund, and is a wholly-owned subsidiary of Bear Stearns Companies Inc.

10.    Bear Stearns Companies Inc. ("BSC") is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York, and is the parent of BSAM, BSSC and BS&Co.  BSC is a public company traded on the New York Stock Exchange under symbol "BSC" and is in the business of providing investment advice.

11.    Defendant Bear Stearns & Co. Inc. ("BS&Co") is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York.  BS&Co acted as placement agent to the Partnership.

12.    Defendants Bear Stearns BSC, BSSM, and BS&Co. are referred to herein as the "Non-Management Defendants".

13.    Defendant Ralph Cioffi ("Cioffi") acted as Senior Portfolio Manager for the Partnership and the Master Fund. Cioffi is also a Senior Managing Director of BSAM, has been with Bear Stearns since 1985 and is a member of BSAM's Board of Directors.

14.    Defendant Ray McGarrigal ("McGarrigal") acted as Portfolio Manager for the Partnership and the Master Fund. McGarrigal is also a Managing Director for BSAM.

15.    Defendant Matthew Tannin ("Tannin") acted as the Chief Operating Officer of the Partnership and of the Master Fund. Tannin is a Senior Managing Director of BSAM.

16.    Defendants BSAM, Cioffi, McGarrigal and Tannin are referred to herein as the "Management Defendants".

## FACTUAL BACKGROUND

17.    The Enhanced Leverage Partnership was formed as a Delaware limited partnership on June 9, 2006. The limited partnership interests offered through the High Grade CPPM were private offerings pursuant to exemptions provided by Section 4(2) of the Securities Act of 1933, Rule 506, and applicable state securities laws. Plaintiff and other members of the Class entered into one or more subscription agreements whereby they invested, collectively over $600 million in the Partnership.

18.    BSAM is the general partner of the Partnership. As set forth in the Partnership's Confidential Private Placement Memorandum dated June 30, 2006 ("PPM") furnished to all members of the Class, including Plaintiff, the partnership was to leverage

the assets of the Partnership 2.75 times through an over the counter, total return swap with Barclay's Bank ("the Leverage Instrument Counterparty", as defined to the Enhanced Leverage PPM). These assets were then to be placed in the Master Fund.

19.     The primary objective of the Master Fund was described in the PPM as follows:

> The Partnership's primary objective is to seek high current income and capital appreciation through the LIBOR.  The Partnership does not currently trade directly but invests synthetically in the Master Fund generally on a 2.75 times leverage basis through the Leverage Instrument. The Master Fund intends to achieve its investment objective primarily through leveraged instruments in investment-grade structured finance securities, although the Master Fund intends to seek investment opportunities beyond the structured finance asset category.  The Master Fund will make investments in CDOs and other structured finance assets, including ABSs, synthetic ABSs, MBSs, and global structured asset securitizations.  The Master Fund will make investments (or otherwise take on risk) in both the traditional "cash" market and the derivatives market.  In additional, the Master Fund may invest in various derivatives, including primarily credit default swaps, but also options, swaps, swaptions, futures and forward contracts (both listed and over-the-counter) on various financial instruments, equity securities and currencies.

20.     The Master Fund's investment strategy was described as follows:

> The Investment Manager will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are attractively priced.  A significant portion of the investment return of the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of the investments (together with any hedging instruments) of the Master Fund and the associated borrowing costs.  Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation.

21.     The PPM also described the duties of the Investment Manager to manage risk and the Master Fund's risk control procedures:

> The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund.  Various models and valuation tools are used to quantify the

likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker dealer and third party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market.

<p style="text-align:center">*        *        *</p>

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or is in default) the credit performance of structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities issued by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards securities held by the Master Fund.

22.     The PPM also indicated the upper limit of the leverage of the Master Fund which was intended to be 27.5 times and no more than 41.25 times the Net Asset Value of the Master Fund (when applying the 2.75 times leverage used with the Barclay's Bank leverage instrument):

In addition to the leverage employed by the Partnership through the Leverage Instrument, the Master Fund itself will borrow money to enable it to invest in securities whose market value exceeds 100% of the Net Asset Value of the Master Fund. As the Master Fund purchases primarily highly rated investment-grade assets, the Master Fund will be capable of using leverage to invest in securities (excluding Repackaged Vehicle Junior Interests) with an aggregate value of as much as fifteen times the

Net Asset Value of the Master Fund. It is the intention of the Investment Manager, however, to limit the Net Average to ten times the Net Asset Value.

23.     The Enhanced PPM described various strategies that BSAM said it would use to hedge some of the fund's leverage exposure and hedge potential market volatility.

24.     The Enhanced Leverage PPM also indicated that part of the investment strategy of the Master Fund was to invest in securities issued by so-called "Repackaging Vehicles" and it would be exposed to greater leverage through these investments:

> While the Master Fund's investment objective may be achieved through direct, leveraged investments in investment grade structured finance securities and other structured finance assets, the Master Fund intends, as part of its strategy, to gain exposure, on a non-recourse, leveraged basis, to investment-grade structured finance securities (such as CDOs). Each such structured vehicle is referred to herein as a "Repackaging Vehicle." The Investment Manager or an affiliate thereof may, but need not, be the collateral manager or similar service provider with respect to a Repackaging Vehicle (each a "Repackaging Vehicle Manager").

<p style="text-align:center">*     *     *</p>

> As part of the Master Fund's investment strategy, the Investment Manager intends, subject to market conditions and other relevant factors, to invest up to 40% of the Net Asset Value of the Master Fund, as measured at the time any investment is made, in equity tranches (or equivalent securities) or Repackaging Vehicles (the "Repackaging Vehicle Junior Interests") subject to the portfolio guidelines imposed by the Leverage Instrument, which restrict such holding to significantly less than 40%. The returns of the Repackaging Vehicle Junior Interests will be generated primarily from the cash flow performance of the investment-grade ABSs, investment grade CDOs and other investment grade assets selected by the Investment Manager in its capacity a collateral manager of the Repackaging Vehicles ("Repackaging Vehicle Collateral Manager").

25.     With respect to the Master Funds' purchase of assets in Repackaging Vehicles, the Enhanced Leverage PPM indicated that the Master Fund would be using more leverage, than the 27.5 to 41.5 times leverage for direct investments in highly rated investment grade assets – up to 60 to 1 leverage ratio measured by the "total par amount

of assets purchased by a Repackaging Vehicle divided by the initial capital contribution of the Repackaging Vehicle Junior Interests." According to the Enhanced Leverage PPM:

> Traditional leverage used in repurchase agreement financing is sensitive to the market price volatility of the assets being financed. If the market price of the assets being financed deteriorates, the Master Fund may be required to post additional margin or, if sufficient margin is not available, may be required to sell a financed position. This form of financing is typically called "mark-to-market recourse financing" because the repurchase counterparty uses the mark-to-market price of the financed assets to determine whether to call for additional margin. Under the arrangements for such financing, the repurchase counterparty has recourse to the assets of the Master Fund used to secure the financing. The leverage inherent in the Repackaging Vehicle Junior Interests, by contrast, may be characterized as "non-mark-to-market" and "non-recourse," as the Repackaging Vehicle does not have the right, upon the deterioration of the market price of its assets, to require additional capital from, and generally has no recourse to the assets of, the holders of Repackaging Vehicle Junior Interests. The initial Repackaging Vehicle Junior Interest capital contribution required by a Repackaging Vehicle is determined by, among other factors, the ratings quality and diversity of the assets held by the Repackaging Vehicle. If the total par amount of assets purchased by a Repackaging Vehicle were divided by the initial capital contribution of the Repackaging Vehicle Junior Interests, the result would be a leverage ratio of approximately 60-to-1. This mathematical ratio is substantially greater than both the gross leverage and Net Leverage ratios targeted by the Master Fund for the portion of its investment portfolio that does not include the Repackaging Vehicle Junior Assets. The Investment Manager anticipates, however, that the risk-adjusted return of Repackaging Vehicle Junior Interests will generally exceed the risk-adjusted return on assets financed under repurchase agreements or other forms of financing.

26.    Nevertheless, the Fund's leverage limitations and exposure to risk were limited, according to the PPM, by the leverage instrument with Barclay's Bank:

> In accordance with the terms of the Leverage Instrument and in consideration of the credit exposure of the Leverage Interest Counterparty to the Master Fund investment portfolio, to the extent that the Leverage Instrument Counterparty invests in the Master Fund to hedge its obligations under the Leverage Instrument, it will be entitled to more frequent and detailed information reports and more favorable liquidity rights than the Limited Partners have with respect to their Interests. Any

such agreement between the Master Fund or the Investment Manager and the Leverage Interest Counterparty will not entitle any other Limited Partner to any more favorable rights with respect to its investment in the Partnership.

In addition, the Leverage Instrument provides that the Leverage Instrument Counterparty may terminate the Leverage Instrument if the Master Fund breaches certain investment guidelines set forth in the Leverage Instrument. The Investment Manager intends to adhere to such guidelines in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

27.     Based on these limitations, the PPM indicated that the Investment Manager would set certain limitations on its investments:

Pursuant to the terms of the Leverage Instrument, the Leverage Instrument Counterparty has the right to terminate the Leverage Instrument under certain conditions, including the breach by the Master Fund of investment guidelines set forth in the Leverage Instrument. The Investment Manager generally intends therefore (but is in no way obligated) to comply with such limitations, including limitations on the Master Fund's exposure to Repackaging Vehicle Junior Interests, limitations on the securities that the Master Fund may hold that are rated below AA by Standard & Poor's or Fitch or Aa2 by Moody's and limitations on the Master Fund's exposure to certain categories of structured finance securities, including CDO Securities, ABS Securities and residential mortgage-backed securities. A copy of the Leverage Instrument, including such limitations, will be made available to Limited Partners and prospective investors upon request to the General Partner, subject to any confidentiality requirements imposed on the Partnership.

Outside of the portfolio guidelines imposed by the Leverage Instrument, the Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA by Standard & Poor's, from Aaa to Aa2 by Moody's or from AAA to AA by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value

will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. The Investment Manager intends, however, to adhere to the portfolio guidelines set forth in the Leverage Instrument in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

28.    BSAM, as General Partner and Investment Manager, received an advisory fee in the amount of approximately 2% of each limited partner's capital account. In addition, BSAM received a "profit share" in an amount equal to 20% of "Net New Income" as measured by the increase in each limited partner's capital account from its previous "high water mark" for the prior period. The measurement of the value of the Partnership, and thus, each capital account of the limited partners was also vested with BSAM. For determining value of traded instruments, BSAM looked to the market price of such securities. However, for Repackaging Vehicle Junior Interests, the Enhanced Leverage PPM provided that "The Investment Manager will use a fair-value methodology for determining the value of the future stream of projected cash flows to Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle."

29.    The PPM provides certain procedures for the withdrawal of funds from a limited partner's capital account. Upon 40 days written notice, a limited partner may withdraw all or a portion of its capital account and incur a 2% fee. Periodic withdrawals without penalty were provided on a quarterly basis with 60 days written notice. The General Partner had the ability to waive these requirements. Moreover, if the withdrawal requests exceeded 25% of the Net Asset Value of the Master Fund, the General Partner

could elect to limit the withdrawals to 25% of the net aggregate value of the Master Fund. These provisions were also waivable by the General Manager.

30.    The provisions set forth in the PPM were also set forth in the Partnership Agreement.

31.    The High-Grade Fund was organized under the same general principles and partnership structure as the Partnership and its assets were similarly invested through a Master Fund structure.  This fund also imploded in July 2007 and, together with the Master Fund, filed for liquidation in the Cayman Islands.

## DEFENDANTS' BREACH OF FIDUCIARY DUTIES
## AND BREACH OF CONTRACT

32.    Each of the Defendants owed fiduciary duties to the Plaintiff and the members of Class, by operation of Delaware law governing limited partnerships and by operation of the Partnership Agreement.  The Defendants, however, willfully breached these fiduciary duties as set forth below and breached the terms of the Partnership Agreement.

33.    As the credit market began contracting in late 2006 and early 2007, the Management Defendants who are charged with stewardship of these highly leveraged Funds assured investors that the woes plaguing the market (*e.g.*, the credit meltdown) would not hamper the Funds' ability to remain profitable.  According to a recent article appearing in *BusinessWeek*, Cioffi in February 2007 went so far as to declare to the Funds' investors that the Funds would be immune from contracting credit market and actually earn a profit. *See* Matthew Goldstein, "Bear Bets Wrong," *BusinessWeek*, Oct. 22, 2007.  Specifically, the article quotes Cioffi as saying, "*We're going to make money on this*. . . . We don't believe what the markets are saying." (Emphasis added.)  Tannin

also joined in the promotion of the Funds by declaring to investors in March 2007 that "we wouldn't have made money in February if we were long, or overexposed, to subprime. . . ." Tannin went on to say he was putting more of his own money into the funds, and that "it was a very bad time to redeem."

34.     However, according to an analysis of internal Fund documents conduced by *BusinessWeek*, Cioffi's and Tannin's public assurances simply did not correlate to the structure of the Funds: "The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south."    Notwithstanding the Management Defendants' assurances, both the High-Grade Fund and the Partnership began reporting losses shortly after Cioffi's and Tannin's endorsements of the Funds' ability to remain profitable.

35.     Specifically, in a report to investors for March 2007, BSAM reported that High-Grade Fund had returned an estimated -3.71%. Commenting on the loss the March 2007 BSAM report stated:

> March was a difficult month for the Fund, as we experienced our first negative return since we started the Fund in October of 2003. Performance suffered in March for two reasons: first, continued weakness in CDOs with exposure to sub-prime collateral caused additional mark downs in our long asset exposure; second, our short positions rose in price as many investors who were short the sub-prime credit default index covered their positions. . . .

36.     In a report dated June 8, 2007, BSAM reported High-Grade Fund's performance for April 2007.  In the June 8, 2007 report, BASM disclosed that High-Grade Fund returned, on an unedited basis, -5.09%, and that this brought the year to date return as of April 30, 2007, to -6.24%.  Also, in the June 8, 2007 report, BSAM informed

investors that it had decided not to accept additional subscriptions into the partnership at this time in light of current market conditions.

37.    High-Grade Fund's negative returns were also experienced by the Partnership. In a June 2007 report on the Partnership's performance, the Partnership informed investors that it was down 23% for the year through April 2007. According to a November 1, 2007 story in *The Wall Street Journal*, the Partnership's disclosure led to demands from investors to withdraw their investments. *See* Kate Kelly, "Bear CEO's Handling Of Crisis Raises Issues," *The Wall Street Journal*, Nov. 1, 2007. In order to raise cash, both Funds began selling billions of dollars of the assets that they had acquired with borrowed money. *Id.* The sudden selling of assets put more pressure on the Funds causing a steep decline in the Funds' values. *Id.* According to the *Journal*:

> In the first week of June, the more leveraged fund [the Partnership] told investors who wanted out that it couldn't immediately return their money. Wall Street creditors that had lent the fund money reacted sharply to this news, making margin calls, or requests for additional collateral. One creditor, Merrill Lynch & Co., which was owed $400 million, seized the assets that backed its loan on June 15.

38.    The situation began to spiral as more lenders began calling in loans that they had previously made to the Funds. Making matters worse, the Funds held only about 1% of their assets in cash, and not the normal 10% that many hedge funds keep on hand for emergencies. Matthew Goldstein, "Bear Bets Wrong," *Business Week*, Oct. 22, 2007. *Business Week* quoted one structured-finance investor who described the Funds' cash to asset ratio as "not prudent investing." Indeed, these ratios violated the terms of the PPM and the partnership agreement.

39.    Also undisclosed to investors, the Master Fund's investments were exceeding the limitations of Barclay's Bank leveraged instrument, thereby creating the

imminent probability of Barclay's calling its 2.75 leverage of the Master Fund. Indeed, as the true value of the Partnership's assets became apparent to Barclay's, it called its investment sending the Partnership into a spiral.

40.    On June 15, 2007, Merrill Lynch seized $400 million in collateral for loans made to one of the Funds. On June 22, 2007, in a desperate move to stop the bleeding Bear Stearns stated that it would lend $3.2 billon to High-Grade Fund to support the collapsing fund. Bear Stearns' injection of cash was too little to too late and could not overcome the willful mismanagement of the Funds.

41.    On July 17, 2007 – approximately five months after Cioffi's and Tannin's assurances to investors – Bear Stearns CEO James E. Cayne ("Cayne") dispatched the following letter to the Funds' investors, informing them that there was essentially no value remaining in either Fund:

> I want to take this opportunity to provide you with an update on the Bear Stearns High-Grade Structured Credit Strategies Fund and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund. A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the Funds. This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.
>
> As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet. The Funds sold assets in an attempt to raise liquidity, but were unable to generate sufficient cash to meet the outstanding margin obligations. As a result, counterparties moved to seize collateral or otherwise terminate financing arrangements they had with the Funds. During June, the Funds experienced significant declines in the value of their assets resulting in losses of net asset value. The Funds' reported performance, in part, reflects the unprecedented declines in the valuations of a number of highly-rated (AA and AAA) securities.
>
> Fund managers and account executives have been informing the Funds' investors of the significant deterioration in performance for May and June. The preliminary estimates show *there is effectively no value left for the*

*investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund as of June 30, 2007.*

***In light of these returns, we intend to seek an orderly wind-down of the Funds over time.*** This is a difficult development for investors in these Funds and it is certainly uncharacteristic of BSAM's overall strong record of performance.

Bear Stearns has been working to achieve the best possible outcome for investors under these circumstances. On June 26th, Bear Stearns committed $1.6 billion in a collateralized repo line to the High-Grade Fund. At this time, approximately $1.4 billion remains outstanding on this line and we continue to believe there are sufficient assets available in the High-Grade Fund to fully collateralize the repo facility.

At Bear Stearns, we have taken the performance of these two funds very seriously and have taken several important steps to restore your confidence in BSAM and affirm our commitment to serving you with excellence. On June 29th, we announced that Jeff Lane was appointed chairman and chief executive officer of BSAM. Tom Marano, head of Bear Stearns' mortgage department, has been assigned to BSAM to aid in achieving orderly sales of the Funds' assets. The risk management function at BSAM has been restructured so that it will now report up to Mike Alix, Bear Stearns' chief risk officer, creating an additional layer of oversight. Mike Winchell, former head of risk management for Bear Stearns and most recently with Bear Wagner, has been engaged to consult with BSAM with regard to its hedge fund risk management function.

As a dedicated team addresses the issues with respect to these particular Funds, Jeff and the rest of the BSAM team remain fully focused on meeting your investment needs.

I have enormous confidence in BSAM and the ability of our talented professionals to bring you the highest quality products and services now and in the future. You can count on us to deliver.

(Emphasis added.)

42.    Seeking to minimize its exposure to the Funds' collapse, on July 26, 2007, Bear Stearns seized the collateral for the loan it had previously made to the High-Grade Fund.

43. The collapse of the Funds resulted in approximately $1.6 billion in investor losses. The Funds filed for bankruptcy protection on August 1, 2007.

44. More shocking than the abrupt demise of the Funds a mere five months after hearing assurances from Cioffi and Tannin, were the disclosures revealing that certain Management Defendants had blatantly breached their fiduciary duties to the Funds by, *inter alia*, selling their interests in the Funds while assuring investors that the Funds would continue to perform. Moreover, the Non-Management Defendants willfully aided the Management Defendants' breaches by ignoring their responsibilities to oversee the activities of the Management Defendants.

45. Several of Bear Stearns' top officials completely disregarded their duty to oversee the conduct of the Management Defendants thereby aiding in the Management Defendants' breaches of their duties to the Funds. For instance, *The Wall Street Journal* reported on November 1, 2007 that during ten critical days in the summer of 2007 when "[t]wo Bear hedge funds were hemorrhaging value;" "[i]nvestors were clamoring to get their money back;" and "[l]enders to the funds were demanding more collateral," Cayne was paying in a bridge tournament in Nashville, Tennessee. The article went on to disclose that "[i]n the critical month of July, [Cayne] . . . spent 10 of the 21 workdays out of the office, either at the bridge event or golfing, according to golf, bridge and hotel records." *See* Kate Kelly, "Bear CEO's Handling Of Crisis Raises Issues," *The Wall Street Journal,* Nov. 1, 2007. The article reported that Spector, who was formerly the head of Bear Stearns' asset management business, was also in Nashville at the bridge tournament during this time. In addition to overseeing Bear Stearns' asset management

business, Spector was also responsible for ensuring adequate risk controls were in place in the asset management business.

46.     The collapse of the Funds forced the Non-Management Defendants to lay blame on a few individuals. According to published reports, on August 1, 2007, Cayne called Spector to express his annoyance over Spector's absence from Bear Stearns' offices during the Fund crisis.   Cayne informed Spector that he had lost Cayne's confidence and should resign. On August 5, 2007, BSC announced Spector's resignation. An analyst at Punk, Ziegel & Co. in Florida stated to *Bloomberg* (in a story dated August 6, 2007) that "by ousting Spector, management is acting as if it 'didn't know what was going on, and that is just totally unsupportable. If there is no oversight system, people should be looking at Jimmy Cayne.'"   Also, Cioffi and Tannin were reassigned and appointed as advisers to the asset management group.

47.     The fallout from the collapse of the Funds continues to this day.

48.     On October 19, 2007, *The Wall Street Journal* reported that Massachusetts securities regulators are investigating whether Bears Stearns traded mortgage-backed securities for its own account with the Funds without notifying the Funds' directors. According to *The Wall Street Journal*, securities experts opined that such behavior could be a "breach[] [of] fiduciary duty if proper disclosure was not made."

49.     Further details of Massachusetts' investigation into the improper trading surfaced on November 15, 2007, when the *Journal* reported that, "Regulators in the office of Secretary of State William F. Galvin say Bear employees improperly made '*hundreds*' of principal trades for the firm's own account with the hedge funds without notifying the funds' independent directors in advance." (Emphasis added.)

50.     Federal prosecutors and the SEC are also examining the circumstances surrounding the Funds' collapse.  In connection with the federal criminal probe, investigators have turned their attention to Cioffi and are examining whether Cioffi was seeking to minimize his exposure to the collapsing Funds by withdrawing his own money from the Partnership while assuring investors that the Funds would weather the credit meltdown and continue to perform.  According to the *Journal*:

> Weeks before the two funds began imploding in April, fund manager Ralph Cioffi moved about $2 million of his own money from the riskier of the two hedge funds into another internal fund with a separate investment strategy. . . .

> Mr. Cioffi's move effectively lowered his exposure to the riskier of the two failed funds when it was on the brink of significant declines. . .

> Speaking to fund investors not long after the money transfer, Mr. Cioffi and a fellow fund manager still were publicly bullish about their two main funds, High-Grade Structured Credit Strategies Fund and a riskier sister fund [the Partnership].

51.     Moreover, "As late as April 25, when they held an investor conference call, the two managers were telling investors that the amount of money investors were attempting to withdraw was lower than the amount of new money coming in. . . ."

52.     Thus, while investors were misled into believing that the market woes would not impact the Funds, the Management Defendants were withdrawing their own money from the Funds.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a), and (b)(3) on behalf any limited partner that invested in either the Partnership or the High-Grade Fund (the "Class").

54.    Excluded from the Class are (a) the Defendants and their officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any Defendant has a controlling interest or of which any Defendant is a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

55.    Plaintiff seeks class certification under Fed. R. Civ. P. 23(b)(3) as to the damages sought herein.

56.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the Management Defendants breached the Partnership Agreement;

(b)    Whether the actions and omissions alleged herein constitute breaches of fiduciary duties owed to the Class by the Management Defendants;

(c)    Whether the actions and omissions alleged herein against the Non-Management Defendants constitute aiding and abetting of breaches of fiduciary duties owed to the Class by the Management Defendants; and

(d)    Whether the members of the Class have sustained damages and, if so, what the appropriate measure of damages should be.

57.    Plaintiff's claims against the Defendants are typical of the claims of the members of the Class as both sustained damages arising out of the Defendants' wrongful conduct as detailed herein.

58.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action lawsuits. Plaintiff has no interests antagonistic to or in conflict with those of the Class and should be named as a representative for the Class.

59.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Breach of Contract
### (Against the Management Defendants)

60.    Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

61.    The Management Defendants owed contractual obligations to Plaintiff and each member of the Class to invest Plaintiff's and the Class' funds pursuant to the terms of the Partnership Agreement.

62.    The Management Defendants breached their contractual obligations under the Partnership Agreement by concealing the true value, the actual risk and the actual performance of the Funds.

63.    Plaintiff and each member of the Class suffered damages as a result of the Management Defendants' breach of the Partnership Agreement.

64.    The Management Defendants are liable to Plaintiff and the Class for the damages resulting from their breach of the Partnership Agreement.

65.    As a direct and proximate result of the Management Defendants' breach of the Partnership Agreement, Plaintiff and the Class suffered injuries for which monetary damages are sought.

## COUNT II

### Breach of Fiduciary Duty
### (Against the Management Defendants)

66.    Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

67.    The Management Defendants, as the general managers of the Funds, owed Plaintiff and the Class the utmost fiduciary duties of due care, good faith, and loyalty.

68.    The Management Defendants failed to fulfill their fiduciary duties in the management of the Funds by failing to manage the Funds under the terms of the Agreement. The Management Defendants failed to fulfill their fiduciary duties in the management of the Funds by willfully concealing the true value of the Funds and the actual performance of the Funds. The Management Defendants failed to fulfill their fiduciary duties in the management of the Funds by engaging in self-dealing by withdrawing their assets while falsely assuring investors that the Funds would weather the sub-prime credit meltdown.

69.    The Management Defendants also breached their fiduciary duty by favoring the interests of the Funds' general partners over the interests of the limited partners.

70.    Plaintiff and the Class have been harmed by these breaches of fiduciary duty when the Management Defendants' breached were disclosed to investors upon the Funds' collapse.  But for the Management Defendants' breached as detailed herein, neither Plaintiff nor the Class would have invested in the Funds nor would they have kept their monies invested in the Funds as news of the sub-prime meltdown began to surface in early 2007.

71.    As a direct and proximate result of the Management Defendants' breach of the Agreement, Plaintiff and the Class suffered injuries for which monetary damages are sought.

## COUNT III

### Aiding And Abetting Breaches Of Fiduciary Duties
### (Against all Non-Management Defendants)

72.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

73.    The Management Defendants owed the Class the fiduciary duties of care, good faith and unflinching loyalty.  That the Management Defendants owe the Class these fiduciary duties is well known to the Non- Management Defendants.

74.    As is detailed in the preceding paragraphs, the Management Defendants have breached their fiduciary duties to the Class.

75.    The Non-Management Defendants aided and abetted the Management Defendants' breaches of fiduciary duty.  Non-Management Defendants actively and knowingly induced the Management Defendants to breach their fiduciary duties to the Class. Non-Management Defendants also colluded with the Management Defendants s in their attempts to circumvent the Management Defendants' fiduciary duties to the Class.

23

76.     Non-Management Defendants colluded in or aided and abetted the Management Defendants' breaches of fiduciary duties, and were active and knowing participants in the Management Defendants' breaches of fiduciary duties owed to Plaintiff and the members of the Class.

77.     Non-Management Defendants participated in the breach of the fiduciary duties by the Management Defendants for the purpose of advancing their own interests.

78.     The Class has been harmed by Non-Management Defendants' aiding and abetting the Management Defendants' breaches of fiduciary duty.

79.     As a direct and proximate result of the Non-Management Defendants' aiding and abetting the Management Defendants' breaches of fiduciary duty, Plaintiff and the Class suffered injuries for which monetary damages are sought.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of itself and the Class as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the representatives of the Class;

A.      Awarding Plaintiff and the Class damages in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

B.      Awarding Plaintiff and the Class punitive or exemplary damages in an to be determined at trial;

C.      Awarding Plaintiff and the Class the costs of this suit, including reasonable attorneys' fees and other disbursements; and

24

    D.     Awarding Plaintiff and the Class such other and further relief as this Court may deem just and proper.

<p align="center"><strong><u>JURY DEMAND</u></strong></p>

Plaintiff hereby demands a trial by jury.

Dated: December 21, 2007

<div style="margin-left: 40%;">

**GRANT & EISENHOFER P.A.**

By: _____

Jay W. Eisenhofer (JE-5593)
Sidney S. Liebesman (SL 8444)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

**GARDY & NOTIS, LLP**

Mark C. Gardy (MG-0338)
James S. Notis (JN-4189)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiff and Proposed Lead
Counsel for the Class*

</div>



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FIC, L.P., individually, and on behalf of all
others similarly situated,

                    Plaintiff,

          v.

BEAR STEARNS ASSET
MANAGEMENT INC., RALPH CIOFFI,
RAYMOND McGARRIGAL, MATTHEW
TANNIN, BEAR STEARNS
SECURITIES CORPORATION, BEAR
STEARNS COMPANIES INC. and BEAR
STEARNS & CO. INC.,

                    Defendants.

---

No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



---

Plaintiff, FIC, L.P. by its undersigned attorneys, as and for this Class Action

Complaint, herein alleges, upon personal knowledge as to itself and its own actions and

upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This is a class action on behalf of purchasers of limited partnership

interests in Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage

Fund L.P. (the "Partnership") against the General Partner of the Partnership, Bear Stearns

Asset Management ("BSAM"), and its managers, Defendants Ralph Cioffi, Raymond

McGarrigal and Matthew Tannin (the "Management Defendants") for engaging in fraud,

willful misconduct, bad faith and gross negligence that amounted to a breach of its

fiduciaries to Plaintiff and the other limited partners in the Partnership. This class action

also seeks relief from those entities who aided and abetted these Defendants' breaches of

fiduciary duty.  Plaintiff also asserts claims arising out the Defendants breach of the limited partnership agreement (the "Partnership Agreement") entered into with Plaintiff.

2.      This case involves the complete collapse of the two hedge funds, both managed by the defendants, the first was Bear Stearns High-Grade Structured Credit Strategies, L.P. ("High Grade Fund") and the second, the Partnership. The Partnership was created by BSAM in June 2006 and raised $642 million from Plaintiff and the Class. The High Grade Fund was created in December 2004. Both hedge funds were managed by the Defendants, and their sudden collapse in July 2003 caused hundreds of millions of dollars in losses to Plaintiff and the Class.  In the Confidential Private Placement Memorandum ("PPM"), the BSAM, General Partner of the Partnership, trumpeted the credentials, competence and expertise of the managers of the Fund and their affiliation with Bear Stearns – one of the most respected Wall Street investment banks and brokerage houses – creating the imprimatur that the Partnership would be managed with the utmost good faith, honesty and loyalty to its limited partners.

3.      The Fund's assets – the Class' investments – were invested through a "Master Fund", an entity organized under the laws of the Cayman Islands and which made its investments under the advice and direction of BSAM and the Management Defendants.  Contrary to the Defendants' representations to the Class, and in dereliction of their duties to the Class, the General Partner and its managers willfully ignored the terms of the PPM and their duties under it and applicable law, misrepresented to the Class the manner in which the Fund would be managed and their assets invested, lied to the Class about the performance of the Fund, inflated the value of the Fund's assets, concealed the true financial relationship between the Fund and entities which provided

2

leverage for the Fund's investments, and protected their own personal investments in the Fund by extracting their personal investments when the Fund appeared to be in serious financial condition, despite denying the same benefit to the Class. These acts also breached the express terms of the Partnership Agreement.

     4.     On July 30, 2007, the Master Fund filed for bankruptcy protection in a Cayman Islands bankruptcy court. The SEC has announced an investigation into illegal insider dealing engaged in by Defendant Cioffi, who withdrew from the Partnership $2 million of his $6 million in his capital account in the weeks before the Fund's collapse. Moreover, Bear Stearns has demoted two of the Management Defendants in connection with their roles in causing the collapse of the Master Fund and Bear Stearns has fired its chief executive, William Spector ("Spector"), who was in charge of asset management for the firm.

## JURISDICTION AND VENUE

     5.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000. The Court has personal jurisdiction over Defendants because Defendants committed material events giving rise to this action in this District and Defendants systematically and continuously conduct business in this state and maintain offices within this District.

     6.     Venue is proper in this District under 28 U.S.C. §1391 because Defendants engaged in substantial conduct relevant to Plaintiff's claims within this District and caused harm to certain class members residing within this District. In addition, pursuant to the agreements entered between the limited partners of the Partnership and the General Partner, all suits arising from the Subscription Agreement

3

and any and all transactions relating thereto may be brought in the courts of the State of New York.

## THE PARTIES

7.      Plaintiff FIC, L.P. is a limited partnership, with its principal residence in San Francisco, California.    Plaintiff is the legal and beneficial owner of a limited partnership interest in the Partnership.

8.      Defendant Bear Stearns Asset Management Inc. ("BSAM") is a corporation organized under the laws of the State of New York with its principal place of business at 383 Madison Avenue, New York, New York.  BSAM is the General Partner in the Partnerships.  BSAM is also the Investment Manager for the Partnership.

9.      Defendant Bear Stearns Securities Corporation ("BSSC") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Metrotech Center North, Brooklyn, New York.  BSSC acted as prime broker and custodian to the Master Fund, and is a wholly-owned subsidiary of Bear Stearns Companies Inc.

10.     Bear Stearns Companies Inc. ("BSC") is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York, and is the parent of BSAM, BSSC and BS&Co.  BSC is a public company traded on the New York Stock Exchange under symbol "BSC" and is in the business of providing investment advice.

11.     Defendant Bear Stearns & Co. Inc. ("BS&Co") is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York.  BS&Co acted as placement agent to the Partnership.

4

12.    Defendants Bear Stearns BSC, BSSM, and BS&Co. are referred to herein as the "Non-Management Defendants".

13.    Defendant Ralph Cioffi ("Cioffi") acted as Senior Portfolio Manager for the Partnership and the Master Fund. Cioffi is also a Senior Managing Director of BSAM, has been with Bear Stearns since 1985 and is a member of BSAM's Board of Directors.

14.    Defendant Ray McGarrigal ("McGarrigal") acted as Portfolio Manager for the Partnership and the Master Fund. McGarrigal is also a Managing Director for BSAM.

15.    Defendant Matthew Tannin ("Tannin") acted as the Chief Operating Officer of the Partnership and of the Master Fund. Tannin is a Senior Managing Director of BSAM.

16.    Defendants BSAM, Cioffi, McGarrigal and Tannin are referred to herein as the "Management Defendants".

## FACTUAL BACKGROUND

17.    The Enhanced Leverage Partnership was formed as a Delaware limited partnership on June 9, 2006. The limited partnership interests offered through the High Grade CPPM were private offerings pursuant to exemptions provided by Section 4(2) of the Securities Act of 1933, Rule 506, and applicable state securities laws. Plaintiff and other members of the Class entered into one or more subscription agreements whereby they invested, collectively over $600 million in the Partnership.

18.    BSAM is the general partner of the Partnership. As set forth in the Partnership's Confidential Private Placement Memorandum dated June 30, 2006 ("PPM") furnished to all members of the Class, including Plaintiff, the partnership was to leverage

the assets of the Partnership 2.75 times through an over the counter, total return swap
with Barclay's Bank ("the Leverage Instrument Counterparty", as defined to the
Enhanced Leverage PPM). These assets were then to be placed in the Master Fund.

19.    The primary objective of the Master Fund was described in the PPM as
follows:

> The Partnership's primary objective is to seek high current income and
> capital appreciation through the LIBOR. The Partnership does not
> currently trade directly but invests synthetically in the Master Fund
> generally on a 2.75 times leverage basis through the Leverage Instrument.
> The Master Fund intends to achieve its investment objective primarily
> through leveraged instruments in investment-grade structured finance
> securities, although the Master Fund intends to seek investment
> opportunities beyond the structured finance asset category. The Master
> Fund will make investments in CDOs and other structured finance assets,
> including ABSs, synthetic ABSs, MBSs, and global structured asset
> securitizations. The Master Fund will make investments (or otherwise
> take on risk) in both the traditional "cash" market and the derivatives
> market. In additional, the Master Fund may invest in various derivatives,
> including primarily credit default swaps, but also options, swaps,
> swaptions, futures and forward contracts (both listed and over-the-counter)
> on various financial instruments, equity securities and currencies.

20.    The Master Fund's investment strategy was described as follows:

> The Investment Manager will use its structuring and research experience
> to identify structured finance securities with fundamentally strong credit
> risk profiles that are attractively priced. A significant portion of the
> investment return of the Master Fund is expected to be current income
> resulting from a positive yield spread between the investment income of
> the investments (together with any hedging instruments) of the Master
> Fund and the associated borrowing costs. Additionally, to the extent that
> the Master Fund's assets increase in value, the Master Fund may realize
> capital appreciation.

21.    The PPM also described the duties of the Investment Manager to manage
risk and the Master Fund's risk control procedures:

> The Investment Manager carries out the Master Fund's investment process
> and risk control procedures by analyzing the potential interest and
> principal flows on the CDO or structured finance securities owned by the
> Master Fund. Various models and valuation tools are used to quantify the

likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker dealer and third party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market.

*       *       *

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or is in default) the credit performance of structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities issued by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards securities held by the Master Fund.

22.    The PPM also indicated the upper limit of the leverage of the Master Fund which was intended to be 27.5 times and no more than 41.25 times the Net Asset Value of the Master Fund (when applying the 2.75 times leverage used with the Barclay's Bank leverage instrument):

In addition to the leverage employed by the Partnership through the Leverage Instrument, the Master Fund itself will borrow money to enable it to invest in securities whose market value exceeds 100% of the Net Asset Value of the Master Fund. As the Master Fund purchases primarily highly rated investment-grade assets, the Master Fund will be capable of using leverage to invest in securities (excluding Repackaged Vehicle Junior Interests) with an aggregate value of as much as fifteen times the

Net Asset Value of the Master Fund. It is the intention of the Investment Manager, however, to limit the Net Average to ten times the Net Asset Value.

23.     The Enhanced PPM described various strategies that BSAM said it would use to hedge some of the fund's leverage exposure and hedge potential market volatility.

24.     The Enhanced Leverage PPM also indicated that part of the investment strategy of the Master Fund was to invest in securities issued by so-called "Repackaging Vehicles" and it would be exposed to greater leverage through these investments:

> While the Master Fund's investment objective may be achieved through direct, leveraged investments in investment grade structured finance securities and other structured finance assets, the Master Fund intends, as part of its strategy, to gain exposure, on a non-recourse, leveraged basis, to investment-grade structured finance securities (such as CDOs). Each such structured vehicle is referred to herein as a "Repackaging Vehicle." The Investment Manager or an affiliate thereof may, but need not, be the collateral manager or similar service provider with respect to a Repackaging Vehicle (each a "Repackaging Vehicle Manager").

<p style="text-align:center">*        *        *</p>

> As part of the Master Fund's investment strategy, the Investment Manager intends, subject to market conditions and other relevant factors, to invest up to 40% of the Net Asset Value of the Master Fund, as measured at the time any investment is made, in equity tranches (or equivalent securities) or Repackaging Vehicles (the "Repackaging Vehicle Junior Interests") subject to the portfolio guidelines imposed by the Leverage Instrument, which restrict such holding to significantly less than 40%. The returns of the Repackaging Vehicle Junior Interests will be generated primarily from the cash flow performance of the investment-grade ABSs, investment grade CDOs and other investment grade assets selected by the Investment Manager in its capacity a collateral manager of the Repackaging Vehicles ("Repackaging Vehicle Collateral Manager").

25.     With respect to the Master Funds' purchase of assets in Repackaging Vehicles, the Enhanced Leverage PPM indicated that the Master Fund would be using more leverage, than the 27.5 to 41.5 times leverage for direct investments in highly rated investment grade assets – up to 60 to 1 leverage ratio measured by the "total par amount

<p style="text-align:center">8</p>

of assets purchased by a Repackaging Vehicle divided by the initial capital contribution of the Repackaging Vehicle Junior Interests." According to the Enhanced Leverage PPM:

> Traditional leverage used in repurchase agreement financing is sensitive to the market price volatility of the assets being financed. If the market price of the assets being financed deteriorates, the Master Fund may be required to post additional margin or, if sufficient margin is not available, may be required to sell a financed position. This form of financing is typically called "mark-to-market recourse financing" because the repurchase counterparty uses the mark-to-market price of the financed assets to determine whether to call for additional margin. Under the arrangements for such financing, the repurchase counterparty has recourse to the assets of the Master Fund used to secure the financing. The leverage inherent in the Repackaging Vehicle Junior Interests, by contrast, may be characterized as "non-mark-to-market" and "non-recourse," as the Repackaging Vehicle does not have the right, upon the deterioration of the market price of its assets, to require additional capital from, and generally has no recourse to the assets of, the holders of Repackaging Vehicle Junior Interests. The initial Repackaging Vehicle Junior Interest capital contribution required by a Repackaging Vehicle is determined by, among other factors, the ratings quality and diversity of the assets held by the Repackaging Vehicle. If the total par amount of assets purchased by a Repackaging Vehicle were divided by the initial capital contribution of the Repackaging Vehicle Junior Interests, the result would be a leverage ratio of approximately 60-to-1. This mathematical ratio is substantially greater than both the gross leverage and Net Leverage ratios targeted by the Master Fund for the portion of its investment portfolio that does not include the Repackaging Vehicle Junior Assets. The Investment Manager anticipates, however, that the risk-adjusted return of Repackaging Vehicle Junior Interests will generally exceed the risk-adjusted return on assets financed under repurchase agreements or other forms of financing.

26.    Nevertheless, the Fund's leverage limitations and exposure to risk were limited, according to the PPM, by the leverage instrument with Barclay's Bank:

> In accordance with the terms of the Leverage Instrument and in consideration of the credit exposure of the Leverage Interest Counterparty to the Master Fund investment portfolio, to the extent that the Leverage Instrument Counterparty invests in the Master Fund to hedge its obligations under the Leverage Instrument, it will be entitled to more frequent and detailed information reports and more favorable liquidity rights than the Limited Partners have with respect to their Interests. Any

such agreement between the Master Fund or the Investment Manager and the Leverage Interest Counterparty will not entitle any other Limited Partner to any more favorable rights with respect to its investment in the Partnership.

In addition, the Leverage Instrument provides that the Leverage Instrument Counterparty may terminate the Leverage Instrument if the Master Fund breaches certain investment guidelines set forth in the Leverage Instrument. The Investment Manager intends to adhere to such guidelines in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

27.    Based on these limitations, the PPM indicated that the Investment Manager would set certain limitations on its investments:

Pursuant to the terms of the Leverage Instrument, the Leverage Instrument Counterparty has the right to terminate the Leverage Instrument under certain conditions, including the breach by the Master Fund of investment guidelines set forth in the Leverage Instrument. The Investment Manager generally intends therefore (but is in no way obligated) to comply with such limitations, including limitations on the Master Fund's exposure to Repackaging Vehicle Junior Interests, limitations on the securities that the Master Fund may hold that are rated below AA by Standard & Poor's or Fitch or Aa2 by Moody's and limitations on the Master Fund's exposure to certain categories of structured finance securities, including CDO Securities, ABS Securities and residential mortgage-backed securities. A copy of the Leverage Instrument, including such limitations, will be made available to Limited Partners and prospective investors upon request to the General Partner, subject to any confidentiality requirements imposed on the Partnership.

Outside of the portfolio guidelines imposed by the Leverage Instrument, the Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA by Standard & Poor's, from Aaa to Aa2 by Moody's or from AAA to AA by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value

will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. The Investment Manager intends, however, to adhere to the portfolio guidelines set forth in the Leverage Instrument in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

28.    BSAM, as General Partner and Investment Manager, received an advisory fee in the amount of approximately 2% of each limited partner's capital account. In addition, BSAM received a "profit share" in an amount equal to 20% of "Net New Income" as measured by the increase in each limited partner's capital account from its previous "high water mark" for the prior period. The measurement of the value of the Partnership, and thus, each capital account of the limited partners was also vested with BSAM. For determining value of traded instruments, BSAM looked to the market price of such securities. However, for Repackaging Vehicle Junior Interests, the Enhanced Leverage PPM provided that "The Investment Manager will use a fair-value methodology for determining the value of the future stream of projected cash flows to Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle."

29.    The PPM provides certain procedures for the withdrawal of funds from a limited partner's capital account. Upon 40 days written notice, a limited partner may withdraw all or a portion of its capital account and incur a 2% fee. Periodic withdrawals without penalty were provided on a quarterly basis with 60 days written notice. The General Partner had the ability to waive these requirements. Moreover, if the withdrawal requests exceeded 25% of the Net Asset Value of the Master Fund, the General Partner

could elect to limit the withdrawals to 25% of the net aggregate value of the Master Fund. These provisions were also waivable by the General Manager.

30.    The provisions set forth in the PPM were also set forth in the Partnership Agreement.

31.    The High-Grade Fund was organized under the same general principles and partnership structure as the Partnership and its assets were similarly invested through a Master Fund structure. This fund also imploded in July 2007 and, together with the Master Fund, filed for liquidation in the Cayman Islands.

## DEFENDANTS' BREACH OF FIDUCIARY DUTIES AND BREACH OF CONTRACT

32.    Each of the Defendants owed fiduciary duties to the Plaintiff and the members of Class, by operation of Delaware law governing limited partnerships and by operation of the Partnership Agreement. The Defendants, however, willfully breached these fiduciary duties as set forth below and breached the terms of the Partnership Agreement.

33.    As the credit market began contracting in late 2006 and early 2007, the Management Defendants who are charged with stewardship of these highly leveraged Funds assured investors that the woes plaguing the market (*e.g.*, the credit meltdown) would not hamper the Funds' ability to remain profitable. According to a recent article appearing in *BusinessWeek*, Cioffi in February 2007 went so far as to declare to the Funds' investors that the Funds would be immune from contracting credit market and actually earn a profit. *See* Matthew Goldstein, "Bear Bets Wrong," *BusinessWeek*, Oct. 22, 2007. Specifically, the article quotes Cioffi as saying, "*We're going to make money on this*. . . . We don't believe what the markets are saying." (Emphasis added.) Tannin

12

also joined in the promotion of the Funds by declaring to investors in March 2007 that "we wouldn't have made money in February if we were long, or overexposed, to subprime. . . ." Tannin went on to say he was putting more of his own money into the funds, and that "it was a very bad time to redeem."

34.    However, according to an analysis of internal Fund documents conduced by *BusinessWeek*, Cioffi's and Tannin's public assurances simply did not correlate to the structure of the Funds: "The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south."    Notwithstanding the Management Defendants' assurances, both the High-Grade Fund and the Partnership began reporting losses shortly after Cioffi's and Tannin's endorsements of the Funds' ability to remain profitable.

35.    Specifically, in a report to investors for March 2007, BSAM reported that High-Grade Fund had returned an estimated -3.71%. Commenting on the loss the March 2007 BSAM report stated:

> March was a difficult month for the Fund, as we experienced our first negative return since we started the Fund in October of 2003. Performance suffered in March for two reasons: first, continued weakness in CDOs with exposure to sub-prime collateral caused additional mark downs in our long asset exposure; second, our short positions rose in price as many investors who were short the sub-prime credit default index covered their positions. . . .

36.    In a report dated June 8, 2007, BSAM reported High-Grade Fund's performance for April 2007. In the June 8, 2007 report, BASM disclosed that High-Grade Fund returned, on an unedited basis, -5.09%, and that this brought the year to date return as of April 30, 2007, to -6.24%. Also, in the June 8, 2007 report, BSAM informed

investors that it had decided not to accept additional subscriptions into the partnership at this time in light of current market conditions.

37.    High-Grade Fund's negative returns were also experienced by the Partnership.  In a June 2007 report on the Partnership's performance, the Partnership informed investors that it was down 23% for the year through April 2007.  According to a November 1, 2007 story in *The Wall Street Journal*, the Partnership's disclosure led to demands from investors to withdraw their investments.  *See* Kate Kelly, "Bear CEO's Handling Of Crisis Raises Issues," *The Wall Street Journal*, Nov. 1, 2007.  In order to raise cash, both Funds began selling billions of dollars of the assets that they had acquired with borrowed money.  *Id.*  The sudden selling of assets put more pressure on the Funds causing a steep decline in the Funds' values.  *Id.*  According to the *Journal*:

> In the first week of June, the more leveraged fund [the Partnership] told investors who wanted out that it couldn't immediately return their money. Wall Street creditors that had lent the fund money reacted sharply to this news, making margin calls, or requests for additional collateral. One creditor, Merrill Lynch & Co., which was owed $400 million, seized the assets that backed its loan on June 15.

38.    The situation began to spiral as more lenders began calling in loans that they had previously made to the Funds.  Making matters worse, the Funds held only about 1% of their assets in cash, and not the normal 10% that many hedge funds keep on hand for emergencies.  Matthew Goldstein, "Bear Bets Wrong," *BusinessWeek*, Oct. 22, 2007.  *BusinessWeek* quoted one structured-finance investor who described the Funds' cash to asset ratio as "not prudent investing."  Indeed, these ratios violated the terms of the PPM and the partnership agreement.

39.    Also undisclosed to investors, the Master Fund's investments were exceeding the limitations of Barclay's Bank leveraged instrument, thereby creating the

imminent probability of Barclay's calling its 2.75 leverage of the Master Fund. Indeed, as the true value of the Partnership's assets became apparent to Barclay's, it called its investment sending the Partnership into a spiral.

40.    On June 15, 2007, Merrill Lynch seized $400 million in collateral for loans made to one of the Funds. On June 22, 2007, in a desperate move to stop the bleeding Bear Stearns stated that it would lend $3.2 billon to High-Grade Fund to support the collapsing fund. Bear Stearns' injection of cash was too little to too late and could not overcome the willful mismanagement of the Funds.

41.    On July 17, 2007 – approximately five months after Cioffi's and Tannin's assurances to investors – Bear Stearns CEO James E. Cayne ("Cayne") dispatched the following letter to the Funds' investors, informing them that there was essentially no value remaining in either Fund:

> I want to take this opportunity to provide you with an update on the Bear Stearns High-Grade Structured Credit Strategies Fund and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund. A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the Funds. This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.

> As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet. The Funds sold assets in an attempt to raise liquidity, but were unable to generate sufficient cash to meet the outstanding margin obligations. As a result, counterparties moved to seize collateral or otherwise terminate financing arrangements they had with the Funds. During June, the Funds experienced significant declines in the value of their assets resulting in losses of net asset value. The Funds' reported performance, in part, reflects the unprecedented declines in the valuations of a number of highly-rated (AA and AAA) securities.

> Fund managers and account executives have been informing the Funds' investors of the significant deterioration in performance for May and June. The preliminary estimates show *there is effectively no value left for the*

15

*investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund as of June 30, 2007.*

*In light of these returns, we intend to seek an orderly wind-down of the Funds over time.* This is a difficult development for investors in these Funds and it is certainly uncharacteristic of BSAM's overall strong record of performance.

Bear Stearns has been working to achieve the best possible outcome for investors under these circumstances. On June 26th, Bear Stearns committed $1.6 billion in a collateralized repo line to the High-Grade Fund. At this time, approximately $1.4 billion remains outstanding on this line and we continue to believe there are sufficient assets available in the High-Grade Fund to fully collateralize the repo facility.

At Bear Stearns, we have taken the performance of these two funds very seriously and have taken several important steps to restore your confidence in BSAM and affirm our commitment to serving you with excellence. On June 29th, we announced that Jeff Lane was appointed chairman and chief executive officer of BSAM. Tom Marano, head of Bear Stearns' mortgage department, has been assigned to BSAM to aid in achieving orderly sales of the Funds' assets. The risk management function at BSAM has been restructured so that it will now report up to Mike Alix, Bear Stearns' chief risk officer, creating an additional layer of oversight. Mike Winchell, former head of risk management for Bear Stearns and most recently with Bear Wagner, has been engaged to consult with BSAM with regard to its hedge fund risk management function.

As a dedicated team addresses the issues with respect to these particular Funds, Jeff and the rest of the BSAM team remain fully focused on meeting your investment needs.

I have enormous confidence in BSAM and the ability of our talented professionals to bring you the highest quality products and services now and in the future. You can count on us to deliver.

(Emphasis added.)

42.    Seeking to minimize its exposure to the Funds' collapse, on July 26, 2007, Bear Stearns seized the collateral for the loan it had previously made to the High-Grade Fund.

43.    The collapse of the Funds resulted in approximately $1.6 billion in investor losses. The Funds filed for bankruptcy protection on August 1, 2007.

44.    More shocking than the abrupt demise of the Funds a mere five months after hearing assurances from Cioffi and Tannin, were the disclosures revealing that certain Management Defendants had blatantly breached their fiduciary duties to the Funds by, *inter alia*, selling their interests in the Funds while assuring investors that the Funds would continue to perform. Moreover, the Non-Management Defendants willfully aided the Management Defendants' breaches by ignoring their responsibilities to oversee the activities of the Management Defendants.

45.    Several of Bear Stearns' top officials completely disregarded their duty to oversee the conduct of the Management Defendants thereby aiding in the Management Defendants' breaches of their duties to the Funds. For instance, *The Wall Street Journal* reported on November 1, 2007 that during ten critical days in the summer of 2007 when "[t]wo Bear hedge funds were hemorrhaging value;" "[i]nvestors were clamoring to get their money back;" and "[l]enders to the funds were demanding more collateral," Cayne was paying in a bridge tournament in Nashville, Tennessee. The article went on to disclose that "[i]n the critical month of July, [Cayne] . . . spent 10 of the 21 workdays out of the office, either at the bridge event or golfing, according to golf, bridge and hotel records." *See* Kate Kelly, "Bear CEO's Handling Of Crisis Raises Issues," *The Wall Street Journal*, Nov. 1, 2007. The article reported that Spector, who was formerly the head of Bear Stearns' asset management business, was also in Nashville at the bridge tournament during this time. In addition to overseeing Bear Stearns' asset management

17

business, Spector was also responsible for ensuring adequate risk controls were in place in the asset management business.

46.    The collapse of the Funds forced the Non-Management Defendants to lay blame on a few individuals. According to published reports, on August 1, 2007, Cayne called Spector to express his annoyance over Spector's absence from Bear Stearns' offices during the Fund crisis. Cayne informed Spector that he had lost Cayne's confidence and should resign. On August 5, 2007, BSC announced Spector's resignation. An analyst at Punk, Ziegel & Co. in Florida stated to *Bloomberg* (in a story dated August 6, 2007) that "by ousting Spector, management is acting as if it 'didn't know what was going on, and that is just totally unsupportable. If there is no oversight system, people should be looking at Jimmy Cayne.'" Also, Cioffi and Tannin were reassigned and appointed as advisers to the asset management group.

47.    The fallout from the collapse of the Funds continues to this day.

48.    On October 19, 2007, *The Wall Street Journal* reported that Massachusetts securities regulators are investigating whether Bears Stearns traded mortgage-backed securities for its own account with the Funds without notifying the Funds' directors. According to *The Wall Street Journal*, securities experts opined that such behavior could be a "breach[] [of] fiduciary duty if proper disclosure was not made."

49.    Further details of Massachusetts' investigation into the improper trading surfaced on November 15, 2007, when the *Journal* reported that, "Regulators in the office of Secretary of State William F. Galvin say Bear employees improperly made '*hundreds*' of principal trades for the firm's own account with the hedge funds without notifying the funds' independent directors in advance." (Emphasis added.)

50.    Federal prosecutors and the SEC are also examining the circumstances surrounding the Funds' collapse.    In connection with the federal criminal probe, investigators have turned their attention to Cioffi and are examining whether Cioffi was seeking to minimize his exposure to the collapsing Funds by withdrawing his own money from the Partnership while assuring investors that the Funds would weather the credit meltdown and continue to perform.    According to the *Journal*:

> Weeks before the two funds began imploding in April, fund manager Ralph Cioffi moved about $2 million of his own money from the riskier of the two hedge funds into another internal fund with a separate investment strategy. . . .

> Mr. Cioffi's move effectively lowered his exposure to the riskier of the two failed funds when it was on the brink of significant declines. . .

> Speaking to fund investors not long after the money transfer, Mr. Cioffi and a fellow fund manager still were publicly bullish about their two main funds, High-Grade Structured Credit Strategies Fund and a riskier sister fund [the Partnership].

51.    Moreover, "As late as April 25, when they held an investor conference call, the two managers were telling investors that the amount of money investors were attempting to withdraw was lower than the amount of new money coming in. . . ."

52.    Thus, while investors were misled into believing that the market woes would not impact the Funds, the Management Defendants were withdrawing their own money from the Funds.

## CLASS ACTION ALLEGATIONS

53.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a), and (b)(3) on behalf any limited partner that invested in either the Partnership or the High-Grade Fund (the "Class").

54.    Excluded from the Class are (a) the Defendants and their officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any Defendant has a controlling interest or of which any Defendant is a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

55.    Plaintiff seeks class certification under Fed. R. Civ. P. 23(b)(3) as to the damages sought herein.

56.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the Management Defendants breached the Partnership Agreement;

(b)    Whether the actions and omissions alleged herein constitute breaches of fiduciary duties owed to the Class by the Management Defendants;

(c)    Whether the actions and omissions alleged herein against the Non-Management Defendants constitute aiding and abetting of breaches of fiduciary duties owed to the Class by the Management Defendants; and

(d)    Whether the members of the Class have sustained damages and, if so, what the appropriate measure of damages should be.

57.    Plaintiff's claims against the Defendants are typical of the claims of the members of the Class as both sustained damages arising out of the Defendants' wrongful conduct as detailed herein.

20

58.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action lawsuits. Plaintiff has no interests antagonistic to or in conflict with those of the Class and should be named as a representative for the Class.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Breach of Contract
### (Against the Management Defendants)

60.     Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

61.     The Management Defendants owed contractual obligations to Plaintiff and each member of the Class to invest Plaintiff's and the Class' funds pursuant to the terms of the Partnership Agreement.

62.     The Management Defendants breached their contractual obligations under the Partnership Agreement by concealing the true value, the actual risk and the actual performance of the Funds.

63.     Plaintiff and each member of the Class suffered damages as a result of the Management Defendants' breach of the Partnership Agreement.

64.    The Management Defendants are liable to Plaintiff and the Class for the damages resulting from their breach of the Partnership Agreement.

65.    As a direct and proximate result of the Management Defendants' breach of the Partnership Agreement, Plaintiff and the Class suffered injuries for which monetary damages are sought.

## COUNT II

### Breach of Fiduciary Duty
### (Against the Management Defendants)

66.    Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

67.    The Management Defendants, as the general managers of the Funds, owed Plaintiff and the Class the utmost fiduciary duties of due care, good faith, and loyalty.

68.    The Management Defendants failed to fulfill their fiduciary duties in the management of the Funds by failing to manage the Funds under the terms of the Agreement.  The Management Defendants failed to fulfill their fiduciary duties in the management of the Funds by willfully concealing the true value of the Funds and the actual performance of the Funds.  The Management Defendants failed to fulfill their fiduciary duties in the management of the Funds by engaging in self-dealing by withdrawing their assets while falsely assuring investors that the Funds would weather the sub-prime credit meltdown.

69.    The Management Defendants also breached their fiduciary duty by favoring the interests of the Funds' general partners over the interests of the limited partners.

70.    Plaintiff and the Class have been harmed by these breaches of fiduciary duty when the Management Defendants' breached were disclosed to investors upon the Funds' collapse.    But for the Management Defendants' breached as detailed herein, neither Plaintiff nor the Class would have invested in the Funds nor would they have kept their monies invested in the Funds as news of the sub-prime meltdown began to surface in early 2007.

71.    As a direct and proximate result of the Management Defendants' breach of the Agreement, Plaintiff and the Class suffered injuries for which monetary damages are sought.

## COUNT III

### Aiding And Abetting Breaches Of Fiduciary Duties
### (Against all Non-Management Defendants)

72.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

73.    The Management Defendants owed the Class the fiduciary duties of care, good faith and unflinching loyalty.    That the Management Defendants owe the Class these fiduciary duties is well known to the Non- Management Defendants.

74.    As is detailed in the preceding paragraphs, the Management Defendants have breached their fiduciary duties to the Class.

75.    The Non-Management Defendants aided and abetted the Management Defendants' breaches of fiduciary duty.    Non-Management Defendants actively and knowingly induced the Management Defendants to breach their fiduciary duties to the Class.  Non-Management Defendants also colluded with the Management Defendants s in their attempts to circumvent the Management Defendants' fiduciary duties to the Class.

23

76.    Non-Management Defendants colluded in or aided and abetted the Management Defendants' breaches of fiduciary duties, and were active and knowing participants in the Management Defendants' breaches of fiduciary duties owed to Plaintiff and the members of the Class.

77.    Non-Management Defendants participated in the breach of the fiduciary duties by the Management Defendants for the purpose of advancing their own interests.

78.    The Class has been harmed by Non-Management Defendants' aiding and abetting the Management Defendants' breaches of fiduciary duty.

79.    As a direct and proximate result of the Non-Management Defendants' aiding and abetting the Management Defendants' breaches of fiduciary duty, Plaintiff and the Class suffered injuries for which monetary damages are sought.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of itself and the Class as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the representatives of the Class;

A.    Awarding Plaintiff and the Class damages in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

B.    Awarding Plaintiff and the Class punitive or exemplary damages in an to be determined at trial;

C.    Awarding Plaintiff and the Class the costs of this suit, including reasonable attorneys' fees and other disbursements; and

    D.    Awarding Plaintiff and the Class such other and further relief as this Court may deem just and proper.

## JURY DEMAND

    Plaintiff hereby demands a trial by jury.

Dated: December 21, 2007

                              **GRANT & EISENHOFER P.A.**

                              By: _____

                              Jay W. Eisenhofer (JE-5593)
                              Sidney S. Liebesman (SL 8444)
                              485 Lexington Avenue, 29th Floor
                              New York, New York 10017
                              Tel: 646-722-8500
                              Fax: 646-722-8501

                              **GARDY & NOTIS, LLP**

                              Mark C. Gardy (MG-0338)
                              James S. Notis (JN-4189)
                              440 Sylvan Avenue, Suite 110
                              Englewood Cliffs, New Jersey 07632
                              Tel: 201-567-7377
                              Fax: 201-567-7337

                              *Counsel for Plaintiff and Proposed Lead Counsel for the Class*